Filed 4/5/23  In re Clayton B. CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re Clayton B., a Person Coming Under the Juvenile Court Law. | B319817 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No 21CCJP01791) |
| Plaintiff and Respondent, | |
| v. | |
| ESTELA L., | |
| Defendant and Appellant. | |

APPEAL from an order and judgment of the Superior Court of Los Angeles County, Pete R. Navarro, Commissioner. Affirmed.

David M. Thompson, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, Interim County Counsel, Kim Nemoy, Assistant County Counsel, and Tracey M. Blount, Deputy County Counsel, for Plaintiff and Respondent.

———————————

Estela L. (mother) appeals from the juvenile court's order awarding mother monitored visitation with her son (Clayton B.) under Welfare and Institutions Code[1] section 362.4 and the judgment upon terminating jurisdiction. Mother argues the court erred in denying her request for unmonitored visits. We disagree and affirm.

## BACKGROUND

I.    **Dependency referral and petition**

The family consists of mother, father, and their son Clayton B. (born May 2006).[2] The family has an extensive referral history beginning in 1998 including substantiated allegations of sexual abuse, physical abuse, general neglect, emotional abuse, and domestic violence. In 2005, prior to Clayton's birth, a dependency proceeding stemming from mother and father's domestic violence, father's substance abuse, mother's inappropriate discipline, and father's sexual abuse of one of the children resulted in a grant of sole legal and physical custody of the children to mother. In

---

[1]    All subsequent statutory references are to the Welfare and Institutions Code unless otherwise specified.

[2]    Mother and father are parents to approximately five or six other older children (the record is not clear as to the exact number), but they are not parties to this case.

2

2012, a dependency proceeding prompted by father's inappropriate discipline and mother's lack of protection resulted in a grant of physical custody of five children, including Clayton, to mother. Recent referrals included allegations of mother hitting father with an iron, a piece of glass, and a laptop on separate occasions, including in the presence of one of their grandchildren. Police call logs reflected four calls to the home over the past year because of conflicts between mother and father.[3]

The current matter came to the attention of the Los Angeles County Department of Children and Family Services (DCFS) in March 2021 after a referral alleging domestic violence between mother and father in Clayton's presence. When interviewed, father confirmed that, on the day of the incident, he was in the garage working on his car when a female neighbor came by and said hello. Mother was watching from a window of the home, and subsequently approached him and accused him of cheating. Mother asked father to leave. Father initially refused, but then relented and asked Clayton to help get the car ready. Mother continued to berate them and grabbed an axe and swung it at father, only to have Clayton take it away from her. Mother then went after father with a tire iron, which Clayton also took from mother. Clayton was not injured. Father called the police and mother was arrested.

---

[3]     Mother's criminal history included arrests for assault with a deadly weapon and spousal battery, while father's criminal history included convictions for forgery, grand theft, petty theft, possession of a controlled substance, robbery, and driving with a suspended license.

Father told DCFS that mother's violence was escalating and she had used objects to try to hurt him in the past. Mother's "mood swings" and multiple personalities concerned father. Mother's issues included jealousy and insecurity; mother quit her job so that she could be home to keep an eye on father. Father had also observed mother talking to herself and he had told mother she needed to seek help. Father did not believe that mother was a danger to Clayton.

When interviewed, Clayton confirmed that he had overheard mother accusing father of cheating on her, after which he had to intervene to grab an axe and tire iron from mother. Clayton also observed mother's mood swings, talking to herself, and her "rages" against father over the last six months. Clayton felt safe and comfortable around father, but not mother, with whom he did not feel close. Mother kicked Clayton out of the home when he defended father.

Mother explained that the incident began when father was talking to a female friend and the friend did not acknowledge mother, which upset her. Mother confronted father, leading to an argument and father leaving the home. Father returned home the next day and the argument continued. Father told mother to leave the home. Mother then grabbed an axe but did not intend to hurt father. When Clayton took the axe away, mother grabbed a tire iron, only to have Clayton take the tire iron away. Mother was arrested and then father bailed her out.

Mother agreed that physical altercations were not appropriate in front of children. Father's involving Clayton in mother and father's arguments made mother upset at times. Mother denied having any mental health issues, including mood swings or hallucinations, but acknowledged having moments

4

where she does not understand what is happening. Mother wanted to work things out with father because they had been together for 30 years.

In interviews later that month, mother and father reported they had not yet enrolled in any programs because they were busy renovating the house. They were also attempting to reconcile. Father reported that he and mother recently had an argument, prompting him to leave the home to avoid further conflict.

Clayton denied any recent further incidents in the home, but said mother was displaying odd behavior, including throwing tiles when no one was present, slamming cabinet doors late at night, and having "anger splats," which Clayton described as mother being upset and yelling. Mother did not attempt to harm Clayton and Clayton was not afraid of mother. He stayed in his room because that was the " 'safest place' " to be. Clayton's school records reflected he was failing his classes and had a 48 percent attendance record.

In April 2021, mother informed the social worker that juvenile court involvement was unnecessary because she participated in programs when her other children were before the court. The social worker responded that her lack of progress despite those programs was concerning. Father informed the social worker he would be moving out.

## II. Petition and detention hearing

In April 2021, DCFS filed a section 300 petition on Clayton's behalf alleging: that mother and father engaged in domestic violence in Clayton's presence, including mother's brandishing an axe and tire iron at father; that mother had untreated mental and emotional problems, including aggressive

5

behavior, fluctuating moods, auditory hallucinations, and talking to herself; and, that father failed to protect Clayton. The petition accordingly alleged that mother's conduct came within the provisions of section 300, subdivisions (a) (serious physical harm), (b) (failure to protect), and (j) (abuse of sibling). The petition further stated that Clayton and his siblings are prior dependents of the juvenile court due to his parents' domestic violence. That same month, the juvenile court detained Clayton from mother and placed him with father.

At the detention hearing, which also took place in April 2021, mother and father entered a general denial. After the parties submitted on DCFS's recommendation that Clayton be released to father's custody, the juvenile court found a prima facie case for detaining Clayton and showing he is a person described by section 300 and continued his placement with father. Mother was granted monitored visitation twice per week not in father's home. The court ordered family maintenance services.

## III. Jurisdiction and disposition

### A. *The jurisdiction and disposition report*

The combined adjudication and disposition hearing was scheduled for June 2021. Prior to it, DCFS submitted a report with updated interviews.

Clayton continued to reside with father, with whom he continued to feel safe. Mother no longer lived in the home but she came by at times to get her belongings, and was angry when she did so. Mother had not visited Clayton; Clayton "d[id] not wish" to visit with mother "at this time."

Clayton stated that he had grown accustomed to his parents' arguments and would go to his room during them.

6

Regarding the referral incident, Clayton recalled that father had gathered his belongings to leave but mother wanted him to leave with nothing. Clayton had to stop the axe mid-air. While Clayton struggled with mother over the axe, mother grabbed a tire iron. Clayton was successful in getting both items away, and then father called the police.

According to Clayton, mother needed "mental help" to get in "the right mind set" because "if you love someone you don't try to hurt or physically abuse them." He did not have a close relationship with mother. He did not believe mother would hurt him, but was concerned about her behavior. Mother had mood swings, became very angry, and would threaten to kick Clayton out of the home when he defended father.

When interviewed, mother's thoughts were scattered and she needed redirection. Addressing the referral incident, mother said that a female friend of father's came to the home and was disrespectful. Mother and father argued and father left the home. When father returned, the argument resumed. When mother picked up an axe, she did so "just to pick it up" and did not brandish the axe at father. However, mother acknowledged wrestling with Clayton over the axe and then grabbing a tire iron, which she then kicked to the side while struggling with Clayton over the axe. Mother claimed the incident was a "misunderstanding," and said that her relationship with Clayton, though needing "a little bit of work," was still "pretty good." Mother denied physical altercations with father in the past, saying that police only responded to the home during verbal altercations.

Regarding her mental health, mother denied talking to herself, saying she did not know what father was talking about

and would have been hospitalized if she were talking to herself. Mother acknowledged that she previously saw "someone" for her mental health but was not diagnosed with anything. That person gave her Benadryl.

When interviewed, father reiterated that mother began talking to herself at the beginning of the year and he told her she needed to seek help. While father did not see her talking to herself again, father described that mother had different personalities, and one personality did not know what the other was doing. Regarding the referral incident, father stated that it happened quickly and was "shocking," but he did not feel personally threatened by mother. Father's arguing with mother had become physical and was "tiresome." Mother would yell in his face and he "couldn't take it" anymore.

Paternal aunt was also interviewed, stating that mother had stayed with her for a month and was helpful. Paternal aunt claimed that Clayton was disrespectful to mother and she had never seen mother raise her voice or get mad. Father and Clayton got along well.

DCFS recommended that mother undergo a psychiatric evaluation and participate in individual counseling, parenting classes, and a 52-week domestic violence program and that father participate in individual counseling, parenting classes, family preservation services, a 52-week domestic violence program, and drug testing.

B.     *The jurisdiction/disposition hearing*

At the June 2021 jurisdictional and dispositional hearing, the court admitted several exhibits into evidence and then heard argument from counsel. Mother asked that the petition be dismissed for lack of sufficient evidence and current risk to

8

Clayton.  She asked that Clayton be released to home of parents or, if the petition was sustained, for unmonitored visits.  Father asked that he be stricken from the petition as nonoffending, and objected to any drug testing requirement given that the petition was based upon mother's mental health issues.  He did not oppose participating in parenting or domestic violence classes, individual counseling, or Clayton remaining placed in his care.  Clayton's counsel asked that the petition be sustained as to mother and that Clayton remain with father.  Clayton did not want to see mother and was "concern[ed]" about her.  Clayton therefore requested that visits remain monitored.

The juvenile court sustained the allegations under section 300, subdivision (a) as pled, but struck the reference to father's failure to protect under section 300, subdivision (b).[4]  At the disposition hearing that followed, Clayton was adjudged a dependent and released to father.  Mother was granted family maintenance services to include a domestic violence program, conjoint counseling with Clayton, individual counseling to address case issues, mental health counseling, and monitored visitation with discretion to liberalize.

IV.     **Six-month status review report and hearing**

In December 2021, DCFS reported that Clayton continued to reside with father and was doing well in father's care.  Mother had been showing up to the home unannounced and refusing to

---

[4]     For completeness, we note the record appears to be silent as to how the court proceeded with the allegation made under section 300, subdivision (j).  The reporter's transcript does not indicate the court struck the allegation.  However, the minute order from that hearing indicates that the court sustained only the allegations under subdivisions (a) and (b).

9

leave, and was admonished not to do so. Mother began domestic violence counseling but was discharged for missing four sessions. She received a psychiatric evaluation in October 2021 and did not meet medical necessity for mental health services. However, the social worker referred her to individual therapy services so that she could be assessed for non-acute, long-term conditions. Mother had a scheduled intake appointment but the social worker could not confirm confirmation of enrollment. Mother had not received a psychological assessment nor been prescribed psychiatric medication. Because mother had not made progress in individual counseling, mother's conjoint counseling with Clayton had not commenced.

Clayton attended monitored visits with mother once or twice per month. The visits were infrequent because Clayton chose to put his schooling, homework, after school swim lessons and social life ahead of visits with mother. The social worker believed that, while Clayton was receptive to suggestions regarding visits, he was "ultimately . . . not interested in consistently visiting" mother. During the visits that did occur, no safety issues or concerns were reported. Because visits were infrequent, mother's visits with Clayton were not liberalized to unmonitored.

The Department recommended that mother and father receive an additional six months of services, and that the court set a three-month progress review hearing to address possible termination of jurisdiction.

Later that month, the juvenile court found that mother and father were in compliance with their services plan. Finding that continued jurisdiction was necessary, services were extended, Clayton's placement continued, and a section 364 review hearing

was set. After mother's counsel requested that visits be unmonitored, the court afforded DCFS the discretion to liberalize visits.

## V.      Nine-month status review report and hearing

In March 2022, DCFS reported that mother enrolled in a domestic violence program, but had attended only one session so it was too early to determine her progress. Mother was actively participating in individual counseling as of January 2022. Mother was diagnosed with adjustment disorder with mixed anxiety and depressed mood. She attended four of six sessions, which, according to her therapist, was not enough time for her to make "any real progress." However, psychiatric services were unnecessary and mother was ready to partake in conjoint therapy with Clayton.

Clayton was still living with father and doing well. Mother and Clayton engaged in monitored visits two or three times per month. The visits were not more frequent because Clayton did not prioritize them. Visits were not liberalized because of mother's insufficient programmatic progress. Further, Clayton was uncomfortable with unmonitored visits, explaining that, while he was not afraid of mother, he was concerned that mother might bring up her relationship with father, which made him stressed. When the social worker conveyed Clayton's comments to mother, mother insisted there was a misunderstanding because Clayton had never conveyed these sentiments to mother. This response concerned the social worker because mother could not understand Clayton's point of view, underscoring the need for conjoint counseling.

11

DCFS recommended termination of the case with a custody order granting father full physical custody and mother and father joint legal custody.

At the initially scheduled March 2022 review hearing, mother requested to return to the family home and keep the case open for an additional three months for reunification. Mother was participating in her programs and conjoint counseling was about to begin. Clayton's counsel asserted that Clayton did not want unmonitored visits and submitted on DCFS's recommendation. The hearing was adjourned to address an unrelated matter relating to the family's housing benefits.

At the continued April 2022 review hearing, mother's counsel reported that mother was actively engaged in domestic violence and individual counseling. Counsel reiterated that mother wished to reunify and requested joint physical and legal custody, or in the alternative, unmonitored visits. Counsel for Clayton, father, and DCFS submitted on DCFS's recommendation that jurisdiction be terminated. Clayton's counsel stated that Clayton wanted to remain in father's home with only monitored visits with mother, describing that a "rift" was present between Clayton and mother even prior to the referral incident, and that rift widened since mother has not been in the home.

The juvenile court terminated jurisdiction, granting father sole physical custody and joint legal custody to both parents. The court ordered monitored visits for mother, citing the "disturbing" nature of mother's conduct and her failure to complete her case plan, and further noting that Clayton "in no uncertain terms,

wishes the visits to remain monitored."[5]  The court further ordered that visits occur two times a week for two hours per visit, and further provided that those visits could be "amplified" to four hours upon agreement of the parties, including Clayton.

Mother timely appealed.

## DISCUSSION

On appeal, mother contends the juvenile court erred in denying her request for unmonitored visits with Clayton. Specifically, mother asserts that the order was not supported by the evidence because unmonitored visits posed no emotional or physical risk or detriment to Clayton.  Further, the juvenile court improperly delegated authority to Clayton to set the terms of visitation and effectively refuse visits altogether.  We find no abuse of discretion in the juvenile court's ruling.

A juvenile court that is terminating jurisdiction is authorized to make orders addressing custody and visitation. (§§ 361.2, 362.4; *In re T.S.* (2020) 52 Cal.App.5th 503, 513 ["When terminating its jurisdiction over a child who has been declared a dependent child of the court, section 362.4 authorizes the juvenile court to issue a custody and visitation order (commonly referred to as an 'exit order')."])  In making exit orders, a juvenile court must consider the best interests of the child.  (*In re John W.* (1996) 41 Cal.App.4th 961, 973.)  We review those orders for an abuse of discretion.  (*Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, 300.)  We cannot disturb the juvenile court's custody determination without an arbitrary, capricious, or

---

[5]     Counsel for DCFS added that although mother was ordered into conjoint counseling with Clayton, Clayton "does not have any interest in conjoint [counseling]."

13

patently absurd exercise of discretion. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318–319; *In re Maya L.* (2014) 232 Cal.App.4th 81, 102.) Where the juvenile court applied the correct legal standards and substantial evidence supports the order, there is no abuse of discretion. (*Jane J. v. Superior Court* (2015) 237 Cal.App.4th 894, 901; *In re Daniel C. H.* (1990) 220 Cal.App.3d 814, 839.)

The juvenile court did not abuse its discretion in ordering that mother's visits with Clayton be monitored. The two primary factors that the juvenile court cited in support of its order were supported by substantial evidence. First, mother had engaged in a sequence of "disturbing" and violent conduct evincing her deteriorating mental health, culminating in her attacking father with an axe and a tire iron, which, but for Clayton's intervention, could have resulted in serious injury or death to father and/or Clayton. Mother repeatedly minimized the seriousness of her violent actions and the existence of any mental health issues. Second, the court correctly relied upon mother's undisputed shortcomings in adhering to her case plan. This ranged from mother's visiting the family's home unannounced and refusing to leave (despite DCFS's admonitions not to do so) to mother's spotty attendance of individual counseling and domestic violence programming. These considerations alone reflect the visitation order was in Clayton's best interest and supported by substantial evidence.

Mother nonetheless contends that monitored visits were not necessary to ensure Clayton's security or well-being. According to mother, her issues stemmed from her relationship with father—not Clayton—and those issues caused Clayton no

14

detriment. Instead, Clayton did not wish to visit with mother because he did not like her. Mother is mistaken.

Clayton never stated he did not wish to visit with mother or did not like mother. To the contrary, he participated in visits, albeit not as often as permitted by the court given his school and social obligations. This led the social worker to conclude that he was "not interested" in more regular visits with mother, not that Clayton did not wish to see mother *at all*. Indeed, Clayton's discomfort appeared to be rooted not in the visits occurring, but the conditions under which they occurred. Clayton was concerned mother would bring up her relationship with father, and the prospect of that occurring in an unmonitored setting made him stressed.

Therefore, even accepting mother's suggestion there was "no indication" that mother actually had brought up mother and father's relationship with Clayton during their visits, the juvenile court could fairly credit Clayton's statements that he was concerned about the likelihood there would be further issues without a monitor present, especially given the traumatizing nature of the referral incident and the extensive history of mother and father involving Clayton in their disputes. Although Clayton insisted he was not afraid of mother, mother's difficulties in her relationship with father and in managing her deteriorating mental health had conspicuous, adverse effects on Clayton, who was struggling in school and often—including during events subsequent to the referral—had to retreat to his room in order to feel safe. For these reasons, the conclusion that monitored

visitation was in Clayton's best interest was eminently reasonable.[6]

Additionally, the juvenile court did not improperly delegate its authority to fashion visitation orders. Mother's contrary arguments misread the record and the relevant authorities. As mother's cases themselves reflect, a juvenile court must often balance the need for regular parent-child visitation with the need to be flexible and receptive to the changing needs of the child and dynamic family circumstances. (*In re S.H.* (2003) 111 Cal.App.4th 310, 317.) A juvenile court is solely empowered to determine whether *any* visitation occurs, and may not delegate that authority to another party, including the child. (*Id.* at pp. 317–318.) However, as to the time, place, and manner of visitation, the inquiry remains whether any limitations are in the child's best interest. Accordingly, the child's input and refusal must be considered, though it may not be the " '*sole* factor.' " (*In*

---

[6] To the extent that mother suggests that a juvenile court must find a detriment to the child in order to impose limitations on visitation in an exit order, mother is mistaken. Because the relevant inquiry as to exit orders made pursuant to section 362.4 is the best interest of the child (*In re John W.*, *supra*, 41 Cal.App.4th at p. 973; *In re Jennifer R.* (1993) 14 Cal.App.4th 704, 712), this is not like other contexts where a detriment finding is required to deny visitation. (§ 362.1, subd. (a); *In re Christopher H.* (1996) 50 Cal.App.4th 1001, 1008; *In re C.C.* (2009) 172 Cal.App.4th 1481, 1491 [visitation under § 362.1 is mandatory unless court finds visitation would pose a threat to the child's safety].) In any event, for the reasons we have set forth above, the juvenile court could have reasonably concluded unmonitored visits were detrimental to Clayton's well-being.

16

*re Julie M.* (1999) 69 Cal.App.4th 41, 49–50; accord *In re S.H.*, at p. 317.)

The juvenile court's exit order adhered to these principles. As mother acknowledges, all of the juvenile court's orders, including its exit orders, contained a required minimum amount of visits, and Clayton was never permitted to entirely refuse visits. Mother's complaints instead appear to stem from the infrequency of visits with Clayton (i.e., the *manner* of visitation). But the court was well within its authority—and was, in fact, required—to consider Clayton's input in determining the manner of visitation, provided it was not the sole factor in its calculus. (*In re Julie M., supra,* 69 Cal.App.4th at pp. 49–50; accord *In re S.H., supra,* 111 Cal.App.4th at p. 317.) That was hardly the case here, given the court's sound reliance upon the severity of the allegations and mother's inability to adhere to her case plan in fashioning its visitation order.

Mother's further suggestion that the juvenile court "left the door open" for Clayton to "possibly stop all visits" by providing that visitation could be changed upon " 'agreement of the parties including Clayton' " is again inaccurate. The portion of the court's order referenced by mother pertains to the *expansion* (not limitation) of visitation, providing that visitation could be "amplified" to four hours by agreement of the parties, including Clayton. In other words, the court did not afford Clayton the veto power that mother suggests.[7]

---

[7] Mother suggests for the first time in her reply brief that by allowing Clayton to refuse to participate in conjoint counseling, Clayton foreclosed any hope that mother had of gaining unmonitored visits. However, even if we were to consider it on

17

On this record, the juvenile court's order for monitored visits was not an abuse of discretion.

---

the merits (*In re Karla C.* (2010) 186 Cal.App.4th 1236, 1269 [appellate court need not consider arguments raised for the first time in reply]), mother's argument once again lacks record support.  None of the court's prior orders permitted Clayton to refuse conjoint counseling.  The primary impediment to conjoint counseling throughout the proceedings was mother's delayed progress with her case plan.  Though counsel for DCFS briefly remarked at the end of the section 364 hearing that Clayton was not interested in conjoint counseling, the court had by that point nearly finished rendering its termination and exit orders, and mother cites no other evidence that Clayton had previously refused conjoint counseling.

## DISPOSITION

The juvenile court's April 2022 judgment and order are affirmed.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

NGUYEN (KIM), J.*

We concur:

LAVIN, Acting P. J.

EGERTON, J.

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.